## MILLS v. GEER et al.

1. Under the act of December 21, 1897 (Acts of 1897, pp. 79–81), in a suit to recover land the defendant who has bona fide possession of such land under adverse claim of title may plead as a set-off the value of all permanent improvements bona fide placed thereon by himself, or other bona fide claimants under whom he asserts title, notwithstanding such improvements may have been made before the passage of the act. In case the legal title is found to be in the plaintiff, and it should further be

found that the value of such improvements at the time of the trial exceeds the mesne profits, while plaintiff is entitled to a verdict in his favor for the land, the defendant is also entitled to a recovery for the amount of excess of the value of such improvements over the mesne profits. The act thus applied is not unconstitutional on account of being retroactive or ex post facto, or on account of its interfering with any vested right of the owner of the land. LUMPKIN, P. J., dissenting.

2. Where the plaintiffs in such an action have been in possession of, or enjoyed the rents, issues, and profits from lands of the defendant which they had received in lieu of the lands involved in the suit, the latter has. a right to plead such benefits derived by plaintiffs as a set-off to their claim for mesne profits against him.

3. Prior to the act of 1889, embodied in Civil Code, § 2545, a judge of the superior court had no authority to pass an order in vacation authorizing a guardian to sell or exchange the lands of his ward for reinvestment, and a deed made by the guardian in pursuance of such an order to a purchaser was void.

4. A defendant, in an action for the recovery of land, who claims credit for improvements made by his predecessor, is likewise liable for all mesne profits chargeable to such predecessor; otherwise, if the defendant claims credit only for such improvements as he himself placed upon the land since his possession.

Argued May 19,—Decided July 12, 1900.

Complaint for land. Before Judge Spence. Calhoun superior court. June term, 1899.

*J. J. Beck* and *W. C. Worrill*, for plaintiff in error.
*R. H. Powell & Son*, contra.

LEWIS, J. Claud W. and Stephen B. Geer brought complaint for land, in Calhoun superior court, against Elijah Mills. The tract involved in the suit was 107 3/4 acres known as the. "Geer home place," and plaintiffs claimed a one-half undivided interest therein as heirs at law of P. F. and L. M. Geer. Suit was for the recovery of this interest, and mesne profits of the land, alleged to be of the yearly value of $400. To this petition the defendant filed an answer, the important portions of which are embodied in amendments, in substance as follows: On August 18, 1886, R. R. Blocker as guardian of plaintiffs and their four brothers (it seems he was duly appointed guardian after the death of their parents), presented to Hon. B. B. Bower, judge of the superior courts of the Albany circuit, his petition,. asking leave to exchange certain lands in Calhoun county, Ga., embracing the land sued for in this case, belonging to his

wards, and in his possession and control as such guardian, for certain lands in Early county, Ga., owned by A. S. Mills. Upon the hearing of this application, on September 14, 1886, the judge granted an order authorizing the exchange prayed for. It seems this order was granted in vacation. On September 20, 1886, a conveyance was made by said guardian, by virtue of the order granted by the judge, to certain tracts of land, among which was the one involved in this suit. In pursuance of the same order, A. S. Mills, on the same date, conveyed to the guardian, for the use of his wards, certain lands in Early county, Ga., amounting to about 500 acres. After the execution of the deeds, A. S. Mills went into the possession of the lands conveyed to him, and Blocker, guardian for plaintiffs and his other wards, took possession of the lands in Early county conveyed to him by Mills, and held possession of the same for the use and benefit of his wards until he died; and during that time received and used the rents, profits, and income from the lands for the use and benefit of plaintiffs and the other wards. After the appointment of the guardian, two of the wards, Walter and Ralph Geer, died, which left but four remaining heirs of the estate. These, including plaintiffs, continued in possession of all the lands in Early county conveyed by Mills to Blocker, their guardian, for some time. Two of them, Charles and Willie, after becoming of age, sold and transferred their interest in the lands in Early county to certain purchasers. A. S. Mills conveyed the land involved in this suit to the defendant, Elijah Mills, executing to him a warranty deed to the same, and put him in possession thereof. It is alleged that the lands conveyed by Mills to the guardian, for the benefit of his wards, were of more value than the lands conveyed by the guardian to Mills; that the defendant had paid the purchaser from the guardian full value of the land in controversy; that this purchaser, A. S. Mills, accepted the conveyance from the guardian in good faith, believing he was getting a good title thereto, and defendant purchased the land in dispute in the best of faith, believing he was getting the best of title thereto. After A. S. Mills got the land in Calhoun county, he made large and valuable improvements thereon, and enhanced its value in the sum of $1,000; and defendant made on

it, since his purchase, improvements of the value of $300; so that the land embraced in the suit was by these improvements enhanced in value to the aggregate amount of $1,300.

The land in Early county conveyed to the guardian for his wards was in good condition for cultivation at the time of the conveyance, woodland, well timbered, and timber valuable; 250 to 300 acres in good condition for cultivation. It had on it a comfortable dwelling, good tenant-house, a good crib and stables, and a ginhouse, and was worth for rent at the time it was delivered to the guardian $250 to $300 per year. After the conveyance to Mills, and especially since the death of the guardian, this land has been greatly neglected; the buildings and improvements have not been kept in repair, the ginhouse and other buildings have been torn down and removed, and those remaining allowed by neglect to go to decay; and a large part of the timber has been cut from the land and sold, plaintiffs and their two brothers having received the benefits of such sale. Plaintiffs, before filing their suit, never made any offer to A. S. Mills to restore to him the possession of his said lands, but continued to hold the same; and it was their purpose, not only to try to recover from the defendant the land sued for, but also to try to hold the land that was conveyed by said A. S. Mills to their guardian. By reason of the sale of a large part of the lands conveyed by Mills to Blocker, guardian, in trust for plaintiffs and their brothers, it was charged that the plaintiffs could not restore Mills his former position. Attached to the answer was an itemized statement of improvements placed by the defendant and his predecessor in title on the land conveyed to Mills by the guardian. The answer prayed, first, that the sale and conveyance of the land sued for by Blocker, guardian, to the plaintiffs and their brothers, be confirmed, and plaintiffs be enjoined from prosecuting suit against the defendant, Elijah Mills, or from recovering said land; that, should it be held plaintiffs have a right to recover, they first be required to account for the rents and profits from said lands in Early county conveyed by A. S. Mills to the guardian, and also that they be first required to pay to defendant the value of the improvements made upon the land sued for. Then follows a prayer for general relief. Plaintiffs below demurred to the above amended plea of the de-

fendant, upon general grounds ; and this demurrer was sustained by the court, except as to the 12th paragraph of the plea, reciting the fact that before filing the suit the plaintiffs had made no offer to restore A. S. Mills possession of his lands deeded by him to their guardian ; and the court also struck the second prayer of the plea, in so far as it prayed that the value of improvements made by defendant in excess of the mesne profits be made a charge against the premises in dispute, in the event it should be determined that plaintiffs had title to the land sued for.    To this judgment of the court the defendant duly filed his exceptions pendente lite, and assigns error thereon in his bill of exceptions.    The case then proceeded to trial before a jury, and they returned a verdict for the plaintiffs for the land in dispute, and for the sum of $93.75, rents and mesne profits therefrom.    Defendant moved for a new trial, and assigns error on the judgment of the court overruling the same on each and every ground.

1. There can be no question that the act of December 21, 1897 (Acts of 1897, pp. 79-81), was intended to apply not only to improvements that might thereafter be erected upon land by bona fide purchasers thereof, but also to all such improvements of the character contemplated by the act which might have been erected by such defendant, or those under whom he claims, prior to its passage.    In fact, the very first section of the act refers in express words to "all cases where an action has been brought for the recovery of land."    Its terms, therefore, were applicable, not only to suits for the recovery of land thereafter brought, but also to such suits as were pending in court at the time of the passage of the act; and necessarily referred to past as well as future improvements.    In the case we are now considering, however, the suit was brought after the passage of the act; and hence it is unnecessary to discuss what would have been the effect had the suit been pending at the time of the passage of the act.    While some courts seem to have made distinctions in this particular, we must confess that we can see no difference in principle whether it was pending when the act was passed, or brought soon after its passage.    The main question is whether the act is unconstitutional on account of it being an ex post facto or retroactive law.    There is no question about the act

being retroactive in its effect, and it may be contended that it is violative of art. 1, par. 2, sec. 3, of the constitution of Georgia, embodied in Civil Code, § 5730; and especially to that provision therein prohibiting the passage of retroactive laws. It can not be said, however, on account of this provision in the constitution, that the General Assembly of Georgia is utterly powerless to enact any valid retrospective legislation. Under repeated rulings of this court, made since the adoption of the constitution of 1877, and having direct reference to this provision in that constitution, validity has been given to legislation retroactive in its effect. We deem it important in this connection only to cite the case of *Pritchard* v. *Savannah St. R. Co.,* 87 *Ga.* 294, where it was held that "An action against a railroad company for personal injuries, pending when the act of November 12, 1889, amending section 2967 of the code, was passed, was not abated by the death of the plaintiff; nor is that act, as applicable to actions pending at the time of its passage, unconstitutional." Justice Lumpkin, in his opinion in that case on page 297, says: "The constitution of 1865 forbade the passage of 'retroactive laws, injuriously affecting any right of the citizen.' No provision against retroactive legislation appears in the constitution of 1868. That of 1877 forbids the passage of a 'retroactive law.' Construing together the above constitutional provisions in connection with the section of the code cited, we take it that they all amount to substantially the same thing, and mean that retroactive laws which do not injuriously affect any right of the citizen — that is to say, laws curing defects in the remedy, or confirming rights already existing, or adding to the means of securing and enforcing the same — may be passed." Sustaining the views of the court in that case, Justice Lumpkin cites a number of authorities. It is not an open question, therefore, in this court, as to what is really meant by the constitutional inhibition against retroactive laws in Georgia. That instrument simply strikes at such retrospective legislation as injuriously affects some substantial right of the citizen. *Bacon* v. *Mayor etc. of Savannah,* 105 *Ga.* 62.

But it is contended by counsel for defendant in error that the act of December 27, 1897 (Acts of 1897, pp. 79–81), in so far as it applies to pre-existing causes of action, is invalid. It is

insisted that plaintiffs' right to recover mesne profits with the land, and their right to recover the land without further offset on account of improvements than the extent of mesne profits, was at the time of the passage of the act a vested right. The controlling question, then, in this case is whether the act in question deprives the plaintiffs, seeking to recover land on a perfect title, of any vested or substantial right, by the defenses therein allowed the defendant touching improvements placed by him or his predecessors in title in good faith upon the land. To determine this question, we will, in this connection, notice what provision the act makes. The first section of the act declares that, "in all cases where an action has been brought for the recovery of land, the defendant who has bona fide possession of such land under adverse claim of title may set off the value of all permanent improvements bona fide placed thereon by himself or other bona fide claimants under whom he claims, and in case the legal title to the land is found to be in the plaintiff, if the value of such improvements at the time of the trial exceeds the mesne profits, the jury may render a verdict in favor of the plaintiff for the land and in favor of the defendant for the amount of the excess of the value of said improvements over the mesne profits." The act then goes on to provide that the verdict shall also find the value of the land itself at the time of the trial, and gives the plaintiff the right to recover the premises by paying the defendant the excess of the value of the improvements over the mesne profits, and in the event that he fails to do so within the time fixed by the court, the defendant shall have the right to pay the plaintiff the value of the land and the mesne profits found by the jury. The act further provides other equitable and just remedies to guard against any wrong to either party, and among them, a commissioner may be appointed by the court and the proceeds of the sale of the land may be divided between plaintiff and defendant in the ratio that the value of the land bears to the excess in value of the improvements over the mesne profits. We simply recite some of these provisions of the act with a view of showing in this connection its general scope and purpose. There can be no question, from reading and studying the entire act, that the purpose of the legislature was to do equal and exact justice between the parties in all cases con-

templated by the provisions of the act. . Now what *right* of the owner of land is there that can be divested by enforcing the provisions of this law? It is a matter that may be regarded now as almost an elementary principle in the construction of constitutional law upon the subject of retroactive legislation, that it does not refer to those remedies adopted by a legislative body for the purpose of providing a rule to secure for its citizens the enjoyment of some natural right, equitable and just in itself, but which they were not able to enforce on account of defects in the law or its omission to provide the relief necessary to secure such right. It is true that this opens a broad field for the exercise of judicial discretion and power, for many cases may arise in which there is no positive written rule from the law-making power that can give the court any substantial aid in arriving at a just conclusion. But this is unavoidable. It is obliged to happen in some instances that, in construing constitutional provisions expressed in general terms touching the rights of the citizen, there is no criterion except a natural sense of right and justice, and no relief can be had to redress a wrong or to enforce a right save to appeal to the enlightened conscience of an impartial judiciary. Courts can not be too cautious to see that ex post facto or retroactive laws shall not divest any citizen of a real right, and they should be equally as cautious in declaring an act of the General Assembly null and void when it seeks to redress a wrong and to apply the remedy it presents not only to future but to past transactions.

The relief provided by the act of 1897 was for those who held property in good faith, honestly believing that they had acquired a good title thereto, and who, upon the faith of such belief, had spent their money and labor in improving the property. Prior to the act of 1897, for want of remedial legislation in this particular, an innocent person might purchase a vacant piece of property of scarcely any appreciable value, place thereon permanent and substantial improvements, enhancing its value a thousandfold,—yea, he might spend thereon his time and labor and means, and even the accumulated fortune of a lifetime in such improvements; and yet the owner, who had delayed asserting his rights until the property had thus been enhanced in value, could reap the fortune placed upon it

and turn the purchaser out a pauper. Neither equity nor natural justice can recognize such a right in one to reap the reward of the labor, services, and fortune of another without paying therefor any compensation whatever. It would be revolting to educated reason and shocking to an enlightened conscience. We may have stated above an extreme case, but in a sense they are extreme cases to which the act was intended to apply. We are aware of nothing in the decisions of this court, or in the judicial opinions of any of its members, from which can be even inferred a denial of such a natural equity as that which this act of 1897 undertakes to protect. For years the decisions of this court touching the right of a bona fide claimant to land who did not have the legal title thereto, for compensation on account of valuable, permanent, and substantial improvements he had placed thereon, seemed to waver in the balance; not upon the idea of any want of such natural equity or of any natural right the owner had in such a case to take the improvements without paying for them, but upon the idea of a want of any remedy provided by the law for a defendant to recover for such improvements in ordinary suits at law for land. Finally, in the case of *Dudley* v. *Johnson,* 102 *Ga.* 1, the question was clearly and definitely settled by this court. It was there decided that "Neither in an action of ejectment nor in complaint for land can a defendant set off the value of improvements placed thereon by him, to an amount beyond the sum which the plaintiff would be entitled to recover by way of mesne profits; nor can a defendant in such a case, upon an equitable answer, recover against a plaintiff the value of improvements in good faith placed upon the premises by such defendant, and have the same, by equitable decree against the owner, made a charge upon the premises on which they are placed, and from which the defendant is evicted under a judgment rendered against him in such suit." There is no intimation, either in the decision or in the opinion of that case, against the natural equities of the defendant under the circumstances, nor is there any intimation that. if the action had been a proceeding in equity by the plaintiff, the defendant might not under equitable principles have obtained the relief sought. As Justice Atkinson says in the opinion on page 5: "The

plaintiffs were not seeking the aid of a court of equity, but sued upon their strictly legal rights.    They were, therefore, not re-quired, upon equitable principles, to make any concession to the defendants."    On page 8, at the conclusion of the opinion, he says: "The General Assembly, by making provision upon this subject, will be presumed to have settled the policy of this State with respect to the allowance for improvements; and it should be left to the wisdom and discretion of that body to say whether rights, in addition to those stated in the sections of the code above referred to, should be conferred upon persons who enter, whether in good or bad faith, upon the property of another, and make valuable improvements thereon."    Upon this suggestion it would seem that the legislature has acted by the passage of the act of 1897; and we are now to determine whether we will give that, act validity and force according to the true legislative intent when it was passed.

An early case on this subject, touching the relative rights of the owner and tenant in relation to improvements put by the latter upon the premises, is the case of Bright *v.* Boyd, 1 Story's Rep. 478.    As that case has been relied on and cited to a con-siderable extent by the courts of last resort in various States of the Union, we will be justified in quoting to some extent from the learned opinion of Justice Story therein.    On page 494 he says:    "The other question, as to the right of the purchaser, bona fide and for a valuable consideration, to compensation for permanent improvements made upon the estate, which have greatly enhanced its value under a title which turns out defec-tive, he having no notice of the defect, is one upon which, look-ing to the authorities, I should be inclined to pause.    Upon the general principle of courts of equity, acting *ex æquo et bono*, I own that there does not seem to me any just ground to doubt that compensation, under such circumstances, ought to be al-lowed to the full amount of the enhanced value, upon the maxim of the common law, *Nemo debet locupletari ex alterius incom-modo.*"    Again, on page 495, seeming to recognize that there was no direct authority upon the subject, he says:    "Now if there be no authority against the doctrine, I confess that I should be most reluctant to be the first judge to lead to such a decision. It appears to me, speaking with all deference to other opinions,

that the denial of all compensation to such a bona fide purchaser in such a case, where he has manifestly added to the permanent value of an estate by his meliorations and improvements, without the slightest suspicion of any infirmity in his own title, is contrary to the first principles of equity. Take the case of a vacant lot in a city, where a bona fide purchaser builds a house thereon, enhancing the value of the estate to ten times the original value of the land, under a title apparently perfect and complete; is it reasonable or just that in such a case the true owner should recover and possess the whole, without any compensation whatever to the bona fide purchaser? To me it seems manifestly unjust and inequitable thus to appropriate to one man the property and money of another, who is no default. The argument, I am aware, is that the moment the house is built it belongs to the owner of the land by mere operation of law; and that he may certainly possess and enjoy his own. But this is merely stating the technical rule of law, by which the true owner seeks to hold what, in a just sense, he never had the slightest title to, that is, the house. It is not answering the objection, but merely and dryly stating that the law so holds. But then, admitting this to be so, does it not furnish a strong ground why equity should interpose and grant relief? I have ventured to suggest that the claim of the bona fide purchaser, under such circumstances, is founded in equity. I think it founded in the highest equity; and in this view of the matter I am supported by the positive dictates of the Roman law. The passage already cited shows it to be founded in the clearest natural equity. *Jure naturæ equum est.*" The writer goes on in his learned opinion to state that it was a grave mistake sometimes made that the Roman law confined its equity or remedial justice on this subject to a mere reduction from the amount of the rents and profits of the land, and he further states that the like principle has been embodied into the law of the modern nations which have derived their jurisprudence from the Roman law, and it was "recognized in France, and enforced by Pothier, with his accustomed strong sense of equity, and general justice, and urgent reasoning," and that it was also recognized in the law of Scotland.

The Supreme Court of Missouri, in treating of the justice and

validity of such laws, uses the following language by Brace, J.,
in the case of Stump *v.* Hornback, 94 Mo. 30: "The object
was not to deprive him [the owner] of his land, with or with-
out his consent, or the possession of it, but simply to withhold
the possession until he paid the occupying claimant the value
such claimant had added to the land by his improvements.
The law said to the owner, you have sought the assistance of
the law to enable you to recover your land from another, who
in good faith believed it was his, and in such faith has enhanced
the value of your property; now you shall have possession of
it, but not until you yourself have done 'that justice which the
law loveth,' and paid that enhanced value to him who hath
earned it." In the case of Saunders *v.* Wilson, 19 Tex. 194, it
was decided that a statute of that State "which secures to pos-
sessors of real property, in good faith, reimbursement from the
true owner, for permanent and valuable improvements made
on the property by the former, [is] consistent with equity and
the civil law, and not inconsistent with the constitution." On
page 196 in the opinion in that case it is declared: "But the
provision that a defendant, a possessor in good faith, through
whose capital and toil the land has received a great accession
in value, should receive full compensation for permanent and
valuable improvements, is liable to no objection, either on con-
stitutional grounds or on those of sound policy or fair and hon-
est dealing between man and man." On page 199 it is ob-
served that this doctrine of reimbursement by the owner for
expenses of improvements made by the possessor in good faith
"was recognized in Roman jurisprudence, the great fountain
of most of the modern law of the civilized world; that it is sanc-
tioned to a great extent in equity, and, in the opinion of Jus-
tice Story, should go the whole length of the remedial justice
administered under our statute." See same subject thoroughly
and ably discussed in Ross *v.* Irving, 14 Ill. 171, 177; Griswold
*v.* Bragg, 48 Conn. 577–581. In the case of Pacquette *v.* Pick-
ness, 19 Wis. 235, the constitutionality of a similar act of the
legislature of that State was called in question. One ground of
the attack made upon the act was that it was in conflict with
section 10, article 1 of the constitution of the United States,
which, among other things, declares that no State shall pass

any ex post facto law, and that it was also contrary to a pro-
vision in the constitution of the State of Wisconsin. Downer,
J., in delivering the opinion of the court in that case, on page
239 says: "We are of opinion that the 'improvement act,' so
called, is constitutional. It is based upon the broad principles
of equity, and, if properly administered, will give to each party
his rights. Similar acts have been in force in many of the
States for more than half a century, and have been so uniformly
held constitutional that we consider ourselves bound by the
great weight of authority in their favor." In the case of Whit-
ney v. Richardson, 31 Vt. 300–310, it appeared that a better-
ment act in that State which related to compensation for im-
provements placed in good faith upon land, restricted its opera-
tion to those who entered before the passage of the act. That
was a suit for betterments upon lands recovered by the defend-
ants of the plaintiff in a previous action of ejectment. It ap-
peared that at the time of the plaintiff's entry the existing act
could not apply to him, on account of the restriction above re-
ferred to, and it was contended that he could not therefore avail
himself of its benefits by virtue of the fact that the restriction
had been removed after his entry. It was decided in that case
that though no law allowing a recovery for betterments existed
at the time of his entry, yet the acts passed subsequently gave
him a right to such recovery.

There was an act in force in Massachusetts that provided,
among other things, that "where any action has been or may
be commenced for the recovery of lands, which the tenant holds
by virtue of a possession and improvement, and of which he, or
those under whom he claims, have had the actual possession for
six years or more, the jury, at the request of the tenant, shall
find the value of the improvements, and also, upon the requisi-
tion of the defendant, shall find the value of the tenements, if
they have not been improved." The act in its other portions
has provisions very similar to our act of 1897, touching the com-
pensation of the defendant for such improvements. It will be
observed that that act by its terms applied to any action, not
only including suits thereafter to be brought, but such as were
pending at the time of the passage of the act. The validity of
that act was sustained in the case of Bacon v. Callender, 6 Mass.

303. For the terms of the act, see page 306. On page 308 of that volume the court says: "The demandant has not contested the constitutionality of this statute, so far as may affect actions sued after its passage, but denies it as affecting actions pending at that time. We see no ground for this distinction; and if it were competent for the legislature to make these provisions, to affect actions after to be commenced, the same provisions might apply with equal authority to actions then pending." Cooley, in his work on Constitutional Limitations, devotes considerable space to a discussion of this identical question. On page 475 he says: "But cases may sometimes present themselves in which improvements actually made by one man upon the land of another, even though against the will of the owner, ought on grounds of strict equity to constitute a charge upon the land improved. If they have been made in good faith, and under a reasonable expectation on the part of the person making them that he was to reap the benefit of them, and if the owner has stood by and suffered them to be made, but afterwards has recovered the land and appropriated the improvements, it would seem that there must exist against him at least a strong equitable claim for reimbursement of the expenditures, and perhaps no sufficient reason why provision should not be made by law for their recovery." After a review of some of the decisions bearing upon the subject, the learned author reaches the following conclusion (page 478): "Betterment laws, then, recognize the existence of an equitable right, and give a remedy for its enforcement where none had existed before. It is true that they make a man pay for improvements which he has not directed to be made; but this legislation presents no feature of officious interference by the government with private property. The improvements have been made by one person in good faith, and are now to be appropriated by another. The parties can not be placed in statu quo, and the statute accomplishes justice as nearly as the circumstances of the case will admit, when it compels the owner of the land, who, if he declines to sell, must necessarily appropriate the betterments made by another, to pay the value to the person at whose expense they have been made. The case is peculiar; but a statute can not be void as an unconstitutional interference with

private property which adjusts the equities of the parties as
nearly as possible according to natural justice."

A number of authorities bearing upon this subject and trend-
ing in the same direction might be cited, for we have by no
means above undertaken to exhaust authority on the subject.
It is true that in all the cases cited the rules of law touching
retroactive legislation are not involved, but all the authorities
are directly in point on the proposition that the act of the Gen-
eral Assembly under consideration does not affect any vested
or substantial right of the owner of property; is not an inter-
ference with private property; is remedial in its nature for
the purpose of enforcing natural right and equity; and, under
the construction of this court as to what is meant by retroact-
ive legislation in our constitution, we think it clearly follows,
both from reason and authority that the act of 1897 does not
fall within any inhibition prescribed by the organic law of this
State.   In some of the cases cited it will be seen that better-
ments acts, similar to the Georgia law of 1897, have been con-
sidered and held valid, notwithstanding constitutional provi-
sions touching retrospective or ex post facto laws, and have been
held not to be unconstitutional because made applicable to
suits pending at the time of their passage... In other cases cited
that question is not directly involved.   For instance, in Texas,
it seems the act under consideration had been in force many
years before the pendency of that suit.   But it does not follow
that even these authorities are not in point, though the States
in which the decisions were rendered should have no constitu-
tional inhibition against retroactive legislation; for if the prin-
ciple decided by those courts is correct, then the character of
legislation we are now considering does not affect any right of
the owner of land.   If this be true, then, under previous de-
cisions of this court, the act in question is not in any manner
retroactive in the constitutional sense of that word.   It impairs
the obligation of no contract; it destroys no vested right; it is
not an unauthorized interference with private property; it
seeks to do right and to prevent wrong.   Our conclusion,
therefore, is that the plaintiff in error is entitled to go before
the jury on the question of the value of improvements placed
upon the land by himself and predecessor in title, and that

he is entitled to a verdict at least to the amount that such permanent improvements had really enhanced the value of the land. Should the jury find this amount exceeds the mesne profits, then it would be their duty to find a verdict in favor of the defendant for the amount of such excess. If the pleadings of plaintiff in error in this case be true, not to apply the above rule would be a peculiar hardship and injustice to him, and an unconscionable advantage to the other parties. For, after greatly deteriorating in value the land they received, they propose now to give it up, and take back land greatly enhanced in value by permanent improvements, without contributing one cent for such increase in worth.

2. A part of the answer that seems to have been stricken by the order of the court in sustaining the demurrer related to the rents, issues, and profits realized by the plaintiffs from the land they had acquired in lieu of the land sued for in this case; and it was prayed in the answer that should it be held the plaintiffs had a right to recover, they should first be required to account for the rents and profits from the land in Early county, as well as for the value of the improvements upon the land in suit. We think there was error in sustaining the demurrer also to this portion of the answer. Whatever benefits the plaintiffs derived from the land exchanged for that involved in this suit, either through their guardian or by themselves after his death, would clearly be a proper subject-matter of set-off against the rents and mesne profits which they claim in the land sued for, whether the profits they derived from the Mills land were rents, or proceeds of the sales of timber or turpentine upon the place. This right of the defendant would seem to be the more patent, if, as a result of their profits in timber, etc., a serious diminution in the value of the land had been caused. Much of the answer gives a detailed history of how the defendant acquired title to the premises in dispute. This is not improper in an answer in such a case, for the reason that it might throw light upon the bona fides of his possession and claim of title, and tend to show that he was in such a position as to claim the improvements under the act of 1897. We therefore think the demurrer should not have been sustained as to any of these allegations. That portion of the answer, however, asking for

a confirmation of the conveyance made by plaintiff's guardian to A. S. Mills, and the conveyance made by him to the guardian, was properly stricken, for the reason which we will hereinafter assign. The above disposes of the questions raised by the exceptions filed pendente lite to the judgment of the court sustaining the demurrer to defendant's answer, and also disposes of some of the grounds in the motion for a new trial.

3. It is contended by counsel for plaintiff in error that the title under which he claims the land sued for originated from an exchange of lands between his grantor and the guardian of defendants in error, made in pursuance of an order of the judge of the superior court authorizing the exchange, and that it was rather in the nature of an investment than a sale of the ward's property. It is further contended, that, at the time this order was granted, the judge of the superior court had authority to authorize guardians to invest the funds of their wards in land, and to pass upon applications for such purpose either in term time or vacation. Civil Code, § 3432, is cited as authority for this position. It provides: "Guardians, trustees, executors, and administrators are authorized to invest any funds held by them as such guardians, trustees, executors, and administrators, in lands; *provided*, an order to that effect be first obtained from the judge of the superior court, who is authorized to consider and pass upon such applications, either in term time or vacation." Civil Code, § 3180, which relates to investments by a trustee holding trust funds in stocks, bonds, or other securities issued by this State, is also cited. This section provides: "Any other investments of trust funds must be made under an order of the superior court, either in term, or granted by the judge in vacation, or else at the risk of the trustee." It is true these sections of the code were the law of this State before the guardian obtained his order to sell or exchange lands of his ward for the lands embraced in this suit. For the same sections see Code of 1882, §§ 2330 and 2541, which are copied in the present Civil Code. It appears in the record that, in the petition to the judge of the superior court to obtain this order, the guardian applied for a guardian at litem to be appointed for the wards; that such a guardian was appointed, accepted the appointment, was directed to investigate and see if it was to the

interest of the wards that the exchange should be made, and that he made a report thereon indorsing the same. While there is some force in the contention of counsel in claiming that this was not a sale, strictly speaking, of the ward's property, but was rather in the nature of an investment, as a matter of law we do not think that either section applies to a case of this character. The sections relate to an investment of funds in the hands of guardians, etc., and do not, by their terms, have any reference to exchanging real estate belonging to minors for other realty. Such a disposition of property of minors is as much a sale thereof as it would be to convey the same for money to be invested in other land; the only difference being, in one case money is paid to the ward for land, and in the other case land is paid for land. But we do not think this an open question in this court. In *Pughsley* v. *Pughsley,* 75 *Ga.* 95, it appears that land was conveyed in fee simple to a woman and her children; it was held that upon application of the woman for herself and minor children, and upon the appointment of a guardian ad litem, the chancellor could not pass an order at chambers authorizing the sale of the land and reinvestment of the fund, that the decree in vacation ordering the sale was void, and the title of the children was not divested thereby. See also *Rogers* v. *Pace,* 75 *Ga.* 436–8, where it was decided : " The judges of the superior courts of this State can do no act nor grant any decree in vacation, unless it be authorized by statute." In the case of *McDonald* v. *McCall,* 91 *Ga.* 304, it appears a devise was made in 1858 to a named person and to a married granddaughter of testatrix, the share going to the granddaughter to be held by the husband in trust for her for life, and at her death to be divided between her children. It was decided in that case that a conveyance made by the trustee in 1860, under an order of the chancellor granted in vacation, passed no title save as to the life-estate of the granddaughter, and would be no obstacle to a recovery of the premises by her children after her death.

In *Crawford* v. *Broomhead,* 97 *Ga.* 614, it was decided : "Prior to the passage of the act of November 11, 1889, relating to sales of the estates of wards for reinvestment, . . the ordinary had jurisdiction and authority to grant to a guardian of a minor

child an order authorizing the guardian to sell unproductive real estate belonging to the ward, for the purpose of reinvesting the proceeds of the sale in other and productive property." Chief Justice Simmons, in his opinion on p. 617, advances the idea that, prior to the passage of the act of 1889, the power of authorizing the sale or disposition of a ward's real estate for the purpose of reinvestment was in the ordinary exclusively; that applications for the sale of property of wards were uniformly made to the ordinary and passed upon by him. He states: "By the act of 1889 the legislature, in its wisdom, took away from the ordinary the power to grant orders.for the sale of the property of wards for this purpose, and conferred it upon the judges of the superior courts, being doubtless of the opinion that the latter would exercise better judgment and discretion than had been exercised by some of the ordinaries in regard to this matter. Whatever may have been the reason, it is clear that this power now rests exclusively in the judges of the superior courts; and it is also clear to our minds that prior to the act of 1889, the power was vested in the ordinaries."

It is argued by counsel for plaintiff in error that the plaintiffs below were not in a position to repudiate the exchange of lands in this case that took place under the order of court, for the reason that they can not put him in his former position as to the ownership of the land conveyed to their guardian, as two of plaintiffs' brothers have disposed of their interest in the lands to other parties. This can not affect the rights of these plaintiffs, for it is not charged that they ever made any disposition of their interest for which they are suing in this action. It is unquestionably true that they, though minors, could not continue to hold their interest in the land purchased by their guardian from Mills, and, at the same time, recover their interest in the estate unlawfully sold by the guardian to Mills. It is also true that the possession, use, and enjoyment of the property bought by their guardian from Mills under the order of court, by these wards after they arrived at age, could be construed into a ratification of the contract of exchange. But, under the record, these do not seem to be important questions to consider. While they were set up in the answer of the defendant below, yet it appears from the record that when the judge

entered up judgment upon the verdict of the jury, he recited therein that plaintiffs expressly disclaimed any intention to hold the lands in Early county deeded by A. S. Mills to R. R. Blocker, guardian, in 1886, and he ordered that that conveyance be cancelled. We do not mean to say, however, that if, before this trial, either of the plaintiffs, after arriving of age, had gone into possession of this land, and used the same, or enjoyed the rents, issues, and profits therefrom, the jury could not have construed this into such a ratification of the exchange made by the guardian and Mills as would bind that plaintiff and prevent his recovery in this case.

4. One ground of complaint made in the motion for a new trial is that the court erred in charging the jury as follows: "Consider all the evidence in the case both for the plaintiffs and defendant, and determine what would be a fair market value for the rents of that place from the time the defendant and his father, or from the time that A. S. Mills, went into possession of it—determine what would be a fair average rental per year from the time they were actually in possession of the land, occupied and used it." It is contended by counsel for plaintiff in error that that charge was erroneous, as defendant could be made chargeable with mesne profits only for such time as he held possession. This would be true if the defendant was claiming compensation only for such improvements as he placed upon the premises; for, as decided in *Gardner* v. *Granniss*, 57 *Ga.* 540: "A defendant in ejectment is not liable for mesne profits taken, prior to his own entry, by those under whom he claims; but if, in accounting for the profits chargeable to himself, he claims credit for improvements made by his predecessors, such improvements must first answer for the profits taken by those who erected them." See also *Willingham* v. *Long*, 47 *Ga.* 540, where it was held: "A defendant in ejectment who has, in good faith, claimed title to the premises, may set off against the rents, not only his own improvements, but he may claim, also, the value of the improvements of those under whom he claims, with warranty, in so far as said improvements exceed in value the rents for which said warrantors were liable."

It seems, in this case, the defendant in his answer claimed

compensation, not only for improvements he placed upon the land after he purchased, but also for improvements placed there by his grantor. We think he had a right to do so, for the presumption is, when he bought, there was also estimated in the valuation of the land the improvements that had been placed thereon, and that he paid for them also; but if he seeks to recover for improvements erected by others, of course they are liable to be reduced by the profits realized by those who erected them, as decided in the case above cited. We think, therefore, there was no error in the charge of the court excepted to in the tenth ground of the amended motion for a new trial.

There are several grounds in the motion relating to newly discovered evidence which, of course, are unnecessary for us to consider, as the case goes back for a new trial, and the parties will have ample opportunity of procuring this testimony at another hearing. The above, we think, covers all the questions in the motion of any merit.

*Judgment reversed.　All the Justices concurring.*

Lumpkin, P. J., concurring specially. I concur in the judgment of reversal, because of the error dealt with in the second headnote and in the corresponding division of the preceding opinion. I also assent to the propositions laid down in the third and fourth headnotes, but dissent from the ruling announced in the first headnote. In so far as the improvement act of 1897 undertakes to deal with the subject of compensating bona fide purchasers of realty whose titles fail for improvements made after its passage, it may be wise, beneficial, and constitutional. To this extent, and to this extent only, so far as I have been able to ascertain, do most of the authorities, including some of those cited by Mr. Justice Lewis, go. In so far as this act relates to improvements made before its passage, I can not help regarding it as retroactive legislation injuriously affecting vested rights. It can not be questioned that, before the enactment of this statute, the owner of land could recover it from one who had made improvements thereon in the honest belief that his title was good, without becoming liable to the defendant on account of such improvements further than to submit to his right to set off the value thereof against the plaintiff's claim for mesne profits. That this was the settled law

and policy of this State is left absolutely free from doubt by the decision of this court in *Dudley* v. *Johnson*, 102 *Ga*. 1. It was there distinctly and unequivocally held that: "Neither in an action of ejectment nor in complaint for land can a defendant set off the value of improvements placed thereon by him, to an amount beyond the sum which the plaintiff would be entitled to recover by way of mesne profits; nor can a defendant in such a case, upon an equitable answer, recover against a plaintiff the value of improvements in good faith placed upon the premises by such defendant, and have the same, by equitable decree against the owner, made a charge upon the premises on which they are placed and from which the defendant is evicted under a judgment rendered against him in such suit." The ruling announced in the language just quoted would, but for the act of 1897, surely be decisive of the alleged right of the defendant. to claim compensation for improvements "beyond the sum which the" plaintiffs "would be entitled to recover by way of mesne profits." Indeed, with that act out of the way, it must be conceded that the point ruled on in the *Dudley* case would be identical with that with which we are now dealing in the case before us. I can not divest myself of the conviction that this act gives to defendants in actions for land a new cause of action — one which they did not have before. It certainly gives them a right to recover of plaintiffs money which they could not have recovered but for the act. I say "recover" because allowing a set-off is, in substance, allowing a recovery. If subjecting one to a liability which could not previously be set up against him does not injuriously affect his rights, I am unable to see why it does not.

This case belongs, I think, to an altogether different class from that of *Pritchard* v. *Railway Co.*, 87 *Ga*. 294. There it was held that a good existing right of action which would have abated upon the death of the plaintiff was saved by an act passed during the pendency of the suit, and that this act, even as applied to actions pending at the time of its passage, was not unconstitutional. The act under consideration in that case created no new cause of action. It merely kept alive good causes of action which would in certain contingencies have abated. The court in effect held that the defendant had no vested right

to have a perfectly lawful demand against him destroyed, and an action therefor abated, merely by reason of the plaintiff's death before obtaining judgment.' The act of 1889 discussed in that case was purely one relating to procedure, and I cited authorities to prove that "A law which merely alters the procedure may, with perfect propriety, be made applicable to past as well as future transactions." The act of 1897, as above stated, brought into existence a new class of demands, and provided for their enforcement. It went far beyond making mere changes in procedure and practice.

Want of time arising from the great pressure of official work forbids that I should attempt to enter upon a more extended discussion of this very important question. I will therefore add nothing more except to suggest that, in endeavoring to apply the "great principles of equity and natural justice" for the protection of purchasers who have made improvements on land not belonging to them, under the honest but mistaken belief that it did, there is danger of running contrary to these same great principles in permitting innocent defendants to "improve out of their property" plaintiffs equally innocent—such, for example, as minors who did not, by standing by and seeing the improvements made, or for any other reason, become, either in justice or equity, liable to such a loss.